USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY KWATINETZ & O'SHEA JACKSON,

                    Petitioners,                    18-cv-6659 (JGK)

          - against -                    MEMORANDUM OPINION &
                                         ORDER
ROGER MASON,

                    Respondent.

JOHN G. KOELTL, District Judge:

Jeffrey Kwatinetz and O'Shea Jackson (collectively "the petitioners") bring this petition for an order to permanently enjoin the respondent, Roger Mason, from continuing to pursue an employment arbitration[1] against the petitioners. The petitioners bring this action under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.

                              I.

The following facts are taken from the declarations and exhibits submitted by the parties, and are undisputed unless otherwise noted.

The petitioners, Jeffrey Kwatinetz and O'Shea Jackson (a/k/a Ice Cube), are co-founders of Big3 Basketball LLC ("Big3"), a professional three-on-three basketball league. Respondent Roger Mason is a former National Basketball

---

[1] The arbitration at issue is Case No. 01-18-0001-1291 before the American Arbitration Association in New York City.

Association ("NBA") player and is the former President and
Commissioner of Big3. Zimmerman Decl., Ex. A ¶¶ 4-5.

Big3 and Mason executed an employment agreement on November
24, 2016, under which Mason was to serve as Big3's President and
Commissioner. Epstein Decl., Ex. 1. Kwatinetz signed the
employment agreement on behalf of Big3. Id. at 20. Section 16 of
the employment agreement provides: "The Company [Big3] and
Executive [Mason] agree that in the event of any dispute or
claim relating to or arising out of the employment relationship
contemplated by this Agreement, Executive and the Company agree
to an arbitration as provided below in this Section 16." Id. at
14.

On March 12, 2018, Big3 terminated Mason's employment.
Zimmerman Decl., Ex. A ¶ 57. The following day, Mason filed an
arbitration demand with the American Arbitration Association
("AAA") against Big3 and Kwatinetz. Epstein Decl. ¶ 4. Mason
filed an amended arbitration demand on May 29, 2018, against
Big3 and the petitioners, alleging various violations of the
employment agreement, including retaliatory discharge, as well
as defamation claims. Id. ¶ 6.

The parties disagree over whether the petitioners can be
compelled to arbitrate. Big3 filed an answer to Mason's amended
arbitration demand on July 13, 2018. Id. ¶ 7. However, because
the petitioners are not signatories to the employment agreement,

the petitioners contend that they are not subject to the jurisdiction of the arbitral forum. Therefore, the petitioners did not join Big3's answer to the demand but rather reserved their rights to contest AAA's jurisdiction over them in court. Id.

On July 13, 2018, the arbitrator held an initial case management conference with counsel and all of the parties named in Mason's amended arbitration demand. Id. ¶ 8. During that conference, counsel for Mason asserted that even though the petitioners were not parties to the employment agreement, the arbitration clause in the agreement is binding on the petitioners. Id. The petitioners disputed that they are bound by the arbitration clause, and they informed the arbitrator that they would file this petition in the Southern District of New York to enjoin the arbitration. Id.

## II.

In deciding a motion to enjoin arbitration, courts apply a standard similar to that used to evaluate a motion for summary judgment. Boroditskiy v. European Specialties LLC, 314 F. Supp. 3d 487, 492 (S.D.N.Y. 2018). Courts "consider all relevant, admissible evidence submitted by the parties and draw all reasonable inferences in favor of the non-moving party." Id. (quotation marks omitted). If the moving party has shown facts entitling it to an injunction against the pending arbitration,

"the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." Veera v. Janssen, No. 05cv2145, 2005 WL 1606054, at *3 (S.D.N.Y. July 5, 2005) (quotation marks omitted).

## A.

The parties disagree over whether the petitioners are subject to the pending arbitration.

"The FAA's primary purpose is to ensure that private agreements to arbitrate are enforced according to their terms." In re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 127 (2d Cir. 2011) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989) (alterations accepted)). Despite the policy in favor of arbitration embodied in the FAA, arbitration is "contractual by nature," and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (quoting United Steelworkers of Am. v. Warrior & Gulf Naviation Co., 363 U.S. 574, 582 (1960)); In re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 127 (2d Cir. 2011); Veera, 2005 WL 1606054, at *3.

Mason contends that whether this dispute is arbitrable is a question for the arbitrator, rather than for the Court. However, "[t]he question whether the parties have submitted a particular

4

dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Schneider v. Kingdom of Thailand, 688 F.3d 68, 71 (2d Cir. 2012) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)).

Mason alleges that in § 16(f) of his employment agreement, the parties "clearly and unmistakably" provided that the issue of arbitrability is for the arbitrator. Section 16(f) incorporates the National Rules for the Resolution of Employment Disputes of the AAA. Those rules prescribe that the arbitrator has the power to rule on questions of jurisdiction, including questions regarding the existence of an arbitration agreement. AAA Employment Arbitration Rules and Mediation Procedures (eff. Nov. 1, 2009). However, because the petitioners are not signatories to the employment agreement, § 16(f) of the employment agreement is not a "clear and unmistakable agreement to arbitrate" on their part. See McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co., Nos. 14cv6633, 14cv6675, 2015 WL 144190, at *5 (S.D.N.Y. Jan. 12, 2015). Accordingly, whether the petitioners are subject to the arbitration agreement is a question for the Court. See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC, 289 F. Supp. 3d 457, 466 (S.D.N.Y. 2018) (holding that "whether [the nonsignatory] is to be a party to the [arbitration agreement] is an issue for

judicial determination first"); <u>Boroditskiy</u>, 314 F. Supp. 3d at 493 (noting that "in cases where a party disputes whether it is bound to an arbitration agreement, the issue of arbitrability is for the Court in the first instance" (quotation marks omitted)); <u>In re D & B Const. of Westchester, Inc.</u>, 875 N.Y.S.2d 819, 2008 WL 4809405, at *6 (Sup. Ct. 2008) (same).

Mason relies on cases that allowed the parties to delegate questions of arbitrability to the arbitrator. However, these cases do not involve the issue of whether nonsignatories are bound by an arbitration agreement but rather involve questions surrounding whether specific claims between signatories are arbitrable. <u>See, e.g.</u>, <u>PaineWebber Inc. v. Bybyk</u>, 81 F.3d 1193, 1195, 1197 (2d Cir. 1996) (question of whether a claim was barred by the statute of limitations was for the arbitrator in light of the parties' clear delegation of authority to the arbitrator to decide such questions). As in this case, where the petitioners contend that they are not "bound to [the] arbitration agreement, the issue of arbitrability is for the Court in the first instance." <u>Boroditskiy</u>, 314 F. Supp. 3d at 493 (quotation marks omitted).

**B.**

The Second Circuit Court of Appeals has recognized five theories upon which a nonsignatory may be bound to an arbitration agreement: "1) incorporation by reference; 2)

6

assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Thomson-CSF, S.A., 64 F.3d at 776. "District courts should narrowly construe these five theories, each of which is governed by ordinary principles of contract and agency law." Boroditskiy, 314 F. Supp. 3d at 493. Mason argues that the petitioners are bound to the arbitration clause under theories of agency and estoppel.

1.

A nonsignatory can be bound to an agreement under traditional principles of agency law. Thomson-CSF, S.A., 64 F.3d at 777. However, an "agreement to arbitrate does not bind an agent acting on behalf of a disclosed principal 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" Veera, 2005 WL at 1606054, at *3 (quoting Lerner v. Amalgam. Clothing & Textile Workers Union, 938 F.2d 2, 5 (2d Cir. 1991)).

Mason cites two cases, Scher v. Bear Stearns & Co., 723 F. Supp. 211 (S.D.N.Y. 1989) and Brener v. Becker Paribas Inc., 628 F. Supp. 442 (S.D.N.Y. 1985), for the proposition that where an entity is bound to arbitrate, its nonsignatory agents can also be bound to arbitrate. However, both of those cases are plainly distinguishable. In those cases, a customer who was party to an arbitration agreement with a brokerage firm sought to avoid

arbitration and sued the brokerage firm and an individual brokerage employee. The courts found that the customer-signatory to the arbitration agreement could not avoid arbitration by suing the brokerage firm and a brokerage employee. The individual brokerage employee could claim the benefit of the arbitration agreement. In Scher, the Court noted that if the signatory-plaintiff were allowed "to avoid arbitration of claims arising out of the [arbitration] agreement, simply by naming individual agents of the institutional party as defendants, it would in effect ignore both the particular arbitration clause and the explicit federal policy in favor of arbitration." 723 F. Supp. at 217. Similarly, in Brener, the plaintiffs argued that they could not be forced to arbitrate against an employee of a signatory because although the plaintiffs had signed the arbitration agreement, the employee had not. 628 F. Supp. at 451. The Court rejected that argument because the plaintiffs' claims fell within the scope of the agreement the plaintiffs signed. Id.

The Second Circuit Court of Appeals, describing Brener and Scher, noted that "[c]ourts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." Roby v. Corporation of Lloyd's, 996 F.2d 1351, 1360 (2d Cir. 1993) (collecting cases). "If it were

otherwise, it would be too easy [for signatory-plaintiffs] to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves." Id.; see also Dunmire v. Hoffman, No. 05cv4582, 2006 WL 2466248, at *3-4 (S.D.N.Y. Aug. 24, 2006) (citing Brener and Scher for the proposition that employees are generally protected by their employers' arbitration agreements); Hirschfeld Prods., Inc. v. Mirvish, 673 N.E.2d 1232 (N.Y. 1996) (holding that nonsignatory employees are permitted to benefit from their employers' arbitration agreements).

In this case, the nonsignatory petitioners do not seek the benefit of an arbitration agreement but rather resist being compelled to arbitrate pursuant to an agreement that they did not sign. Scher and Brener both adhere to the principle that "a court will estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 62 (2d Cir. 2001) (quotation marks omitted). The reverse, however, "is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." Id.

The respondent in this case is attempting to bind nonsignatories -- the petitioners -- to an arbitration agreement to which they never agreed. Kwatinetz signed the employment agreement on behalf of a disclosed principal, Big3. The signature line on the agreement shows that the signature is for "Big3 Basketball, LLC," with Jeffrey Kwatinetz signing on Big3's behalf. Epstein Decl., Ex. 1 at 20. Mason concedes in his opposition papers that "Kwatinetz executed the Employment Agreement on behalf of the Company," rather than in his individual capacity. Opp'n at 11. Because Kwatinetz signed the agreement on behalf of a disclosed principal, Big3, the arbitration agreement would only bind Kwatinetz if there were evidence that Kwatinetz "clearly and explicitly intended to be subject to the arbitration clause." See McKenna Long & Aldridge, 2015 WL 144190, at *8; In re D & B Const. of Westchester, Inc., 21 Misc. 3d 1125(A), 875 N.Y.S.2d 819, 2008 WL 4809415, at *6 (Sup. Ct. 2008) (explaining that it is "well settled that an agent who signs on behalf of a known principal cannot be held to have made a commitment in his or her individual capacity").

Mason has not pointed to any evidence showing that Kwatinetz possessed the requisite intent to be bound to the arbitration clause. Mason argues that such intent can be inferred from (1) the fact that the employment agreement refers to the petitioners in various sections and (2) § 16(d) of the

employment agreement, which refers to arbitrating claims that involve executives of Big3.

The sections of the employment agreement that mention the petitioners, however, are entirely unrelated to arbitration. Section 2(a), for example, states that Mason was to be the senior-most executive officer of Big3 behind the petitioners. Section 5(c) refers to Mason's capital contributions and ownership interest in the LLC. Section 14(f) provides that Mason would have good reason to resign if the agreement were assigned to another company, other than a company managed by the petitioners. In sum, none of these provisions relate to arbitration. These clauses do not "clearly and explicitly" evince an intent on behalf of the petitioners that they be bound to arbitrate. Indeed, Mason points to no cases holding that mere mention of a nonsignatory in an agreement is enough to bind that nonsignatory to the agreement. That the petitioners are mentioned by name in the agreement, in clauses entirely unrelated to arbitration, is not enough to bind the petitioners -- as agents of a disclosed principal -- to the principal's contractual agreement to arbitrate.

Mason also relies on § 16(d) of the employment agreement to argue that the petitioners are bound to arbitrate. That subsection, entitled "Class Action and Collective Waiver," provides that

> [t]he arbitrator shall not have authority to hear or decide class or collective actions, or any representative actions on behalf of other employees. The arbitrator's authority to resolve disputes and make awards under this Section 16 is limited to disputes between: (i) Executive and the Company or any of its subsidiaries; and (ii) Executive and any current or former officers, directors, employees and agents, if such individual is sued for conduct arising out of their employment.

Epstein Decl., Ex. 1 at 15. Mason alleges that romanette (ii) binds the petitioners, along with any other current or former officer, director, employee, or agent of Big3 to submit to arbitration. Section 16(d), however, is not a grant of jurisdiction to the arbitrator over nonsignatories to the agreement. Because romanette (ii) refers to nonparties to the agreement, romanette (ii) must refer to situations where those nonparties consent to arbitrate. Mason's suggestion that romanette (ii) should be construed as an agreement by nonsignatories to be bound to arbitrate is unreasonable. Under Mason's construction, romanette (ii) would apply to bind all employees of Big3 to arbitrate, regardless of their knowledge of or distance from the agreement. A reasonable construction of the contract is that § 16(d) applies in situations where nonsignatories agree to arbitrate.

Mason next argues that the petitioners are estopped from avoiding arbitration because the petitioners directly benefited from Mason's services to Big3, which were provided for in Mason's employment agreement.

Nonsignatories are estopped from avoiding arbitration when they receive a direct benefit from a contract that contains an agreement to arbitrate. McKenna Long & Aldridge, 2015 WL 144190, at *9. "In order for a party to be estopped from avoiding arbitration, that party must have knowingly exploited the agreement containing the arbitration clause" and received direct benefits from the agreement. Veera, 2005 WL 1606054, at *4.

A benefit is direct when it "flow[s] directly from the agreement." Lang v. First Am. Title Ins. Co., No. 12cv266S, 2012 WL 5221605, at *3 (W.D.N.Y. Oct. 22, 2012) (quotation marks omitted). A benefit is indirect, and therefore insufficient to estop a party from avoiding arbitration, "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." Id. (quotation marks omitted).

In American Bureau of Shipping v. Tencara Shipyard S.P.A., the Second Circuit Court of Appeals concluded that nonsignatory owners of a boat were estopped from avoiding arbitration because the owners had received a direct benefit from a contract

containing an arbitration agreement. 170 F.3d 349, 353 (2d Cir. 1999). In that case, the nonsignatory owners contracted with a shipyard to build a yacht. Id. at 351. The contract required that the yacht built by the shipyard be "classed." Id. The shipyard entered a separate contract, which contained an arbitration clause, with a classification society. Under that contract, the classification society "classified" the yacht so that it could sail under the French flag. Id. at 351. The Court of Appeals held that the owners received a direct benefit from the contract containing the arbitration clause because that contract enabled the yacht to be "classed" -- a benefit that the owners had sought in their original contract with the shipyard. Id. at 353. "In short, the agreement was made by one of the signatories for the purpose of completing business it had with the nonsigning owners." MAG Portfolio Consultant, 268 F.3d 58 at 63 (discussing Tencara Shipyard). The benefits derived from the agreement were sought specifically for the owners, "and the owners directly [benefited] . . . because getting the vessel classified enabled it to be insured by the owners at rates cheaper than would otherwise be available, and it enabled the vessel to fly under the flag of a country." Id.

Similarly, Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., involved a contract regarding the use of the trade name "Deloitte," which contained an arbitration clause. 9 F.3d

1060, 1064 (2d Cir. 1993). A nonsignatory to the agreement received a copy of the agreement, was aware of its terms, raised no objections to the agreement, and made use of the Deloitte trade name pursuant to the agreement. Id. That nonsignatory was estopped from avoiding arbitration because it had exploited and directly benefited from the agreement. Id.

On the other hand, the Second Circuit Court of Appeals has found benefits to be indirect when the nonsignatory had obtained benefits that did not flow from the agreement itself. See MAG Portfolio Consultant, 268 F.3d at 62. For example, in Thomson-CSF, two companies, E & S and Rediffusion, signed an exclusive dealing agreement containing an arbitration clause. 64 F.3d at 775. Thomson, a competitor to E & S, purchased Rediffusion and refused to adhere to the exclusive dealing contract. Id. By doing so, Thomson effectively shut E & S out of the market. Id. at 779. However, the Second Circuit Court of Appeals held that the benefit of shutting a competitor out of the market derived from purchasing Rediffusion, and therefore only indirectly flowed from the exclusive dealing contract between Rediffusion and E & S. Id.

This case is more similar to those where the Court of Appeals found that the nonsignatories only indirectly benefited from the relevant agreements. The benefits that came from Mason's employment did not flow directly to the petitioners, but

15

rather to Big3. The petitioners only benefited because of their interests in Big3. The "mere fact of a nonsignator[y's] affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is," Oppenheimer & Co. v. Deutsche Bank AG, No. 09cv8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010).

Mason alleges that Big3, which is controlled by the petitioners, directly benefited from the employment agreement by gaining Mason as its President and Commissioner. Opp'n at 12. Mason asserts that because the petitioners were not "lowly employees" but instead were the senior-most executives of Big3, they also benefited from the agreement. Id. This is because the petitioners had a financial stake in Big3, and therefore when Big3 increased in value as a result of Mason's work under the employment agreement, the petitioners benefited. However, the "mere existence of an agreement with attendant circumstances that prove advantageous to the nonsignatory would not constitute the type of direct benefits justifying compelling arbitration by a nonparty to the underlying contract." In re Belzberg v. Verus Invs. Holdings Inc., 21 N.Y.3d 626, 633-34 (App. Div. 2013). Any benefits that the petitioners received were indirect benefits. As Mason himself argues, the petitioners benefited from the positive performance of Big3, not directly from the contract itself.

Mason also argues that the petitioners exploited the employment agreement by directing Big3 to terminate Mason. However, Mason does not state that the petitioners acted in their individual capacities in directing Big3 to terminate Mason, rather than as agents of Big3. Nor does Mason argue that the petitioners terminated Mason; Big3 terminated Mason. By arguing that the petitioners should be required to arbitrate because of actions they took on behalf of their principal, Big3, Mason seeks to abrogate the corporate form. Mason, however, has not provided any basis for that abrogation. See also Phx. Cos., Inc. v. Abrahamsen, No. 05cv4894, 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006) (no estoppel where the nonsignatory did not exploit -- and thereby assume -- the agreement).

### III.

Kwatinetz signed the agreement only on behalf of a disclosed principal, and the petitioners did not exploit the agreement in their individual capacities or receive direct benefits from the agreement. Therefore, the theories under which Mason argues that the nonsignatories can be compelled to arbitrate do not apply to these petitioners. Rather, the general rule that nonsignatories cannot be forced to arbitrate applies to the petitioners. Accordingly, the petition to permanently enjoin Mason's pending arbitration against the petitioners is **granted.**

**CONCLUSION**

For the above reasons, the petition to enjoin arbitration against the petitioners is **granted.** The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The Clerk of Court is directed to enter judgment and to close this case. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

Dated:    **New York, New York**
          **December 20, 2018**

                                    **John G. Koeltl**
                        **United States District Judge**